**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ST. PAUL FIRE AND MARINE INSURANCE**
**COMPANY,**

       **Plaintiff,**

**v.**                                  **Case No. 8:05-cv-962-T-TBM**

**SEA QUEST INTERNATIONAL, INC., and**
**TRIDENT SHIPWORKS, INC.,**[1]

       **Defendants.**

_____/

**O R D E R**

    THIS MATTER is before the court on **Sea Quest International, Inc.'s Motion for**

**Summary Judgment and Incorporated Memorandum of Law** (Doc. 45), Plaintiff's

response in opposition (Doc. 52), **St. Paul Fire and Marine Insurance Company's**

**Dispositive Motion for Summary Judgment** (Doc. 47), and Defendant's response (Doc.

51).[2]  By their cross-motions, the parties seek summary judgment on the claims raised by

Plaintiff in its two-count Complaint for declaratory relief as to the Marine General Liability

("MGL") policy of insurance (Count I) and the Bumbershoot ("excess") liability policy of

insurance (Count II), both of which were issued by St. Paul to Trident.

_____

     [1]Trident Shipworks, Inc. ("Trident") is named as a nominal Defendant in this action as
a bankruptcy order, discussed *infra*, was previously entered allowing litigation to proceed
against Trident only to the extent of available insurance coverage.

     [2]Additionally, Sea Quest International, Inc. ("Sea Quest") filed a separate statement of
undisputed facts (Doc. 46), and St. Paul Fire and Marine Insurance Company ("St. Paul") filed
additional exhibits (Doc. 48).

I.

A.

The historical facts are fairly undisputed. Sea Quest and Trident entered into an agreement in November 1996 for the construction of a 117-foot luxury yacht by Trident. Thereafter, disputes arose between Sea Quest and Trident regarding various aspects of the construction, including the timeliness of construction and whether the vessel was being built in accordance with the plans and specifications. Approximately two years later, Sea Quest served Trident with a notice of default and demanded arbitration pursuant to the terms of their agreement.[3] Shortly thereafter, Trident filed for bankruptcy, and the matter was stayed. In November 1999, the bankruptcy court entered an order granting relief from the automatic stay to allow Sea Quest to pursue litigation against Trident outside the bankruptcy to the extent of available insurance. *See* (Docs. 46 at 2-4; 47 at 2).

In March 2000, St. Paul filed a declaratory judgment action against Sea Quest and Trident in this court (the "First Coverage Action") for the purpose of determining the rights and liabilities under several policies of insurance issued by St. Paul to Trident. *See St. Paul v. Sea Quest*, Case No. 8:00-cv-571-T-MSS. In response, Sea Quest counterclaimed, alleging breach of contract based upon St. Paul's refusal to pay under the MGL policy, the excess policy, and two Builder's Risk policies. *Id.* In October 2001, the court determined that Sea Quest had prematurely asserted its claims under the MGL and excess policies based on the

---

[3]The arbitration panel entered an "interim award" in the amount of $700,000 against Trident and in favor of Sea Quest which was subsequently vacated by the Bankruptcy Court. (Doc. 47-2 at 5).

express "no action" clauses in those policies and thus dismissed those claims.[4]  *Id.*  There

followed a bench trial on Sea Quest's claims for coverage under the two Builder's Risk

policies issued by St. Paul.[5]  On March 21, 2002, the court issued its Bench Order wherein the

court directed judgment be entered in favor of Sea Quest and against St. Paul under the

Builder's Risk policies.  The order included detailed findings of fact.  (Doc. 47-2).  As for

damages, the court found St. Paul liable to Sea Quest in the amount of $2,001,945.22 in

damages and prejudgment interest, plus attorneys' fees and costs.  *Id.*[6]  The parties appealed

certain aspects of the Bench Order to the court of appeal.  In April 2003, the Eleventh Circuit

reversed the finding of coverage under the Builder's Risk policies.[7]  *See* (Doc. 47-3).

---

[4]This dismissal was affirmed on appeal by the Eleventh Circuit which held, "[t]he
court agrees with the district court's reasoning that the [MGL and Bumbershoot] policies' 'no
action' clauses rendered the claims [under those policies] premature." *See* (Doc. 47-3 at 12).

[5]As the trial judge summarized the claims, Sea Quest contended there was coverage
because the damages resulted from Trident's negligent and defective construction of the yacht.
St. Paul urged that there was no coverage under the Builder's Risk policies because they
covered only fortuitous losses and not losses caused by the defective and incomplete
workmanship at the hands of Trident. *See* (Doc. 47-2 at 6-7).

[6]In summary, the court noted that the yacht was poorly constructed by Trident and
ultimately left unfinished when Trident declared bankruptcy.  Finding coverage under the
Builder's Risk policies, the court awarded damages for three categories of losses: (1) cost of
repairs for items that were negligently constructed by Trident; (2) cost of repairs for defective
items and damages caused by Trident's intentional misconduct; and (3) cost for items that
were not yet completed.  Certain other damages were rejected by the court, including damages
under the "failure to launch" provision. *See* (Doc. 47-2 at 8-16).

[7]In particular, the court held that poor workmanship alone was insufficient to allow for
coverage under the "all risks" provision of the policies.  By the court's analysis, had Sea Quest
wanted to ensure completion of the vessel in a prescribed manner by a certain date, it should
have obtained a performance bond.  The award of damages to Sea Quest was reversed.  (Doc.
47-3).

In March 2002, Sea Quest instituted an action for negligence and breach of contract against Trident in state circuit court in Miami, Dade County, Florida (the "Underlying Action").[8]  *See* (Doc. 1-4).  During the pendency of that action, St. Paul provided its insured, Trident, with a defense under the MGL policy, subject to a reservation of rights.  In June 2005, the state court granted Sea Quest's motion for summary judgment and entered final judgment against Trident based upon the findings of fact in the Bench Order.[9]  The trial court's judgment in favor of Sea Quest was affirmed by the state appellate court with the exception that the award of damages was reduced by $300,000.  *See Sea Quest Internat'l, Inc. v. Trident Shipworks, Inc.*, 958 So. 2d 1115 (Fla. Dist. Ct. App. 2007).  Consistent with that opinion, an Amended Final Judgment awarding Sea Quest $3,543,155.30 in damages and prejudgment interest was entered in the Underlying Action in October 2007.  *See* (Doc. 47-5).  Recovery was limited to the insurance proceeds available to Trident, per the order of the Bankruptcy Court of November 1, 1999.  *Id.* at 3.

In May 2005, St. Paul filed the instant complaint against Sea Quest and Trident seeking declaratory relief that it had no obligation to defend or indemnify Trident under either the MGL or the Bumbershoot policies in the Underlying Action.  (Doc. 1).  Pending the conclusion of the Underlying Action, the instant matter was stayed to "avoid possible piecemeal litigation and [to] allow the court to address all the issues that might potentially

---

[8]The case was subsequently transferred to Hillsborough County Circuit Court.

[9]The state court award was made on the breach of contract claim as the negligence claim was previously dismissed upon motion by Trident.  *See Sea Quest Internat'l*, 958 So. 2d at 1118.

come before it."[10]  (Doc. 34 at 5-6).  Following the final determination in Sea Quest's favor in the Underlying Action, the case was reopened in January 2008.  *See* (Doc. 39).  In February 2009, Sea Quest filed its Answer, Affirmative Defenses, and Counterclaim.  (Doc. 41).  By its counterclaim, Sea Quest sues St. Paul for breach of the MGL and excess policies and for enforcement of the judgment in the Underlying Action.

### B.

The relevant policies of insurance are the MGL and Bumbershoot policies.[11]  In practical terms, since St. Paul provided its insured with a defense in the Underlying Action, the issue for the court's consideration is whether St. Paul is obligated to indemnify Sea Quest for the damages awarded in that action.  The parties agree that the findings of this court in the First Coverage Action, which were not altered by the Eleventh Circuit, are binding.

By its motion, St. Paul contends that no coverage exists under the MGL Policy for the costs of repairing Trident's defective workmanship as the damages awarded to Sea Quest in the Underlying Action are not "property damage" as such is defined in the policies. Generally, St. Paul urges that in deciding whether it must indemnify Trident, the court

---

[10]St. Paul filed a notice of appeal of this court's Order staying the action, but the Eleventh Circuit dismissed St. Paul's appeal for lack of jurisdiction.  *See* (Doc. 37).

[11]The MGL Policy and Bumbershoot Policy have been filed with the court.  *See* (Docs. 45-3, 45-4, 45-5).  At arguments, counsel for St. Paul noted that the insurance under the MGL policy was primary; it was agreed that if there was coverage under the MGL policy, it would follow that there was coverage under the excess policy.  Accordingly, the focus is on the MGL policy.

5

considers the policy coverages in light of the facts in the underlying case.[12]  It contends the burden is on Sea Quest to prove that coverage exists, and that under Florida law, Sea Quest cannot meet its burden.  Citing *Auto-Owners Insurance Co. v. Pozzi Window Co.*, 984 So. 2d 1241, 1248-49 (Fla. 2008), St. Paul argues that under Florida law the cost of repair or replacement of a subcontractor's defective work does not, standing, alone, constitute covered "property damage."  Since the findings in the Bench Order limit damages to the cost of repairing and completing Trident's defective work, there is no covered property damage under either policy.  Alternatively, St. Paul argues that exclusions contained in the MGL and excess policies nevertheless apply to bar coverage.  Specifically, St. Paul urges that at all pertinent times, the yacht was under construction on Trident's premises.  Under the MGL policy, coverage is excluded for property damage to property on the insured's premises for purposes of having operations performed on the property by or on behalf of the insured or to property in the custody of the insured which is to be installed, erected or used in construction by the insured.[13]  Under Florida law, courts have enforced such "operations exclusions" to bar

_____

[12]St. Paul cites *Underwriters at Lloyds London v. STD Enterprises*, *Inc.*, 395 F. Supp. 2d 1142, 1147 (M.D. Fla. 2005) and *Travelers Indemnity Co. of Illinois v. Royal Oak Enterprises, Inc.*, 344 F. Supp. 2d 1358, 1366 (M.D. Fla. 2004).

[13]Exclusions (A)(2)(a) and (c) provide that the insurance afforded under the policy is subject to the following exceptions:

> (2)     except with respect to liability under a written sidetrack agreement for the use of elevators
>
> > (a)     to property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured, . . .

coverage.[14]  Florida courts also enforce "care, custody or control" exclusions[15] to bar

coverage.  Thus, St. Paul contends that even if there is coverage, these exclusions apply to bar

coverage for property damage to the vessel during construction at Trident.[16]

In response, Sea Quest disputes that the award by the state court does not constitute

"property damage" under the subject policies.  Specifically, Sea Quest relies upon the holding

---

> (c)     to property in the custody of the insured
>         which is to be installed, erected or used in
>         construction by the insured, . . .

(Doc. 45-3 at 33).

[14]St. Paul cites *Oak Ford Owners Association v. Auto-Owners Insurance Co.*, 510 F. Supp. 2d 812, 818-20 (M.D. Fla. 2007); *American Equity Insurance Co. v. Van Ginhoven*, 788 So. 2d 388, 390-91 (Fla. Dist. Ct. App. 2001); *Mansfield Industrial Coatings, Inc. v. Employers National Insurance Corp.*, 557 So. 2d 221, 222 (Fla. Dist. Ct. App. 1990).

[15]The "Supplementary Clauses" section of the Bumbershoot policy here contains similar exclusionary language:

> I. Conditional Exclusions
>
> As respects all activities of the Assured (except liability arising out of ownership, charter, use, operation, maintenance, loading or unloading of, or as a bailee of, any watercraft not otherwise excluded or limited herein), this insurance shall be free from liability (unless coverage is provided in a policy listed in the Schedule of Underlying Insurance, and then coverage under this policy shall operate as excess of such coverage):
>
> > (e) for damage, loss, or expense to another's property while in the care, custody or control of the Assured.

(Doc. 45-5 at 32).

[16]St. Paul cites *Phoenix of Hartford v. Holloway Corp.*, 268 So. 2d 195, 198-99 (Fla. Dist. Ct. App. 1972).  S*ee also Blue Marlin Constr. Co. v. Gen. Star Indemn. Co.*, 16 F. Supp. 2d 762, 764-66 (S.D. Tex. 1998).

in *Pozzi Window, supra,* wherein that court concluded that property that was not initially defective, but became defective due to faulty installation constituted "property damage" under a policy which similarly defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." Here, Sea Quest was awarded damages for the negligent construction and restoration costs of the yacht. The record does not reveal nor does the Bench Order find that the materials used to construct the yacht were defective prior to their installation – they became defective only as a result of Trident's negligent construction. Accordingly, Sea Quest urges that the damages awarded are covered "physical loss or property damage" under the policies. Furthermore, it urges that St. Paul cannot rely on any exclusion to defeat coverage.

On Sea Quest's motion, it urges that it is entitled to judgment in its favor because the court has found property damage, in contemplation of the policies, resulting from an occurrence and no exclusion or condition exists to bar coverage. *See* (Doc. 45). More particularly, it cites the finding of negligent construction in the Bench Order, and argues that the negligent construction of the yacht is considered "property damage" under St. Paul's policies based upon Florida courts' broad construction of the term "property damage."[17] Further, errors in construction, such as here occurred, which were neither expected nor intended are an "occurrence" as that term is defined in the policies as well.[18] Alternatively,

---

[17]Sea Quest cites *State Farm Fire & Casualty Co. v. CTC Development Corp., Inc.*, 720 So. 2d 1072 (Fla. 1998); *McCreary v. Florida Residential Property & Casualty Joint Underwriting Association*, 758 So. 2d 692, 694 (Fla. Dist. Ct. App. 1999).

[18]Sea Quest cites *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 888-89 (Fla. 2007); *Auto-Owners Insurance Co. v. Travelers Casualty & Surety Co.*, 227 F. Supp. 2d

Sea Quest argues that coverage exists for Trident's breach of contract based upon the "Additional Coverages Endorsement" which expressly expands the definition of "incidental contract."[19] As set forth in its response to St. Paul's motion, Sea Quest again argues that no exclusion applies to bar coverage under the MGL and excess policies. It contends that both the late notice defense and the defense arising from Trident's assignment agreement with Sea Quest fail due to St. Paul's failure to comply with Fla. Stat. § 627.426 (2). It urges that Exclusion (A)(1) is inapplicable to the circumstances of this case because the yacht under construction was in no way owned or occupied by Trident, nor "held for sale" or entrusted "for storage or safekeeping."[20] Furthermore Exclusion (A)(2) is inapplicable because St. Paul cannot "mend the hold"– that is to say, an insurer may not, "after litigation has begun, change his ground, and put his conduct upon another and different consideration."[21] However, even if St. Paul were permitted to "mend its hold," Sea Quest urges that Endorsement #31 modifies or eliminates exclusion (A)(2) rendering it ambiguous, and any ambiguity in the policy should be

_____

1248 (M.D. Fla. 2002).

[19]Sea Quest cites *Natchitoches Parish School Board v. Shaw*, 620 So. 2d 412, 414 (La. Ct. App. 1993).

[20]Sea Quest cites *Harbor Court Assoc. v. Kiewit Construction Co.*, 6 F. Supp. 2d 449 (D. Md.1998).

[21]In support, Sea Quest cites numerous cases. *See e.g. Luckenbach S.S. Co. v. W.R. Grace*, 267 F. 676, 679 (4th Cir. 1920). It urges that this legal principle is a form of judicial estoppel recognized in this Circuit. *See Brooks v. Laurent*, 98 F. 647, 655 (5th Cir. 1899); *American States Ins. Co. v. McGuire*, 510 So. 2d 1227 (Fla. Dist. Ct. App. 1987); *Heimer v. Travelers Ins. Co.*, 400 So. 2d 771, 772-73 (Fla. Dist. Ct. App. 1981).

liberally construed in favor of the insured.[22]  Regardless, the specific exclusions at (A)(2)(a) and (A)(2)(c) are simply inapplicable by their plain terms.

In response, St. Paul asserts essentially the same argument concerning coverage[23] and exclusions raised in its motion.  (Doc. 52).  It urges that the "mend the hold" argument is without merit because it did raise Exclusion (A)(2) in the First Coverage Action and even if it had not, Sea Quest makes no showing of prejudice.  It urges both Exclusions (A)(2)(a) and (A)(2)(c) are applicable to the particular circumstances of the case.  It contends that Sea Quest's argument on the expanded definition of "incidental contract" is inapposite since the expanded definition had the effect of narrowing an exclusion not relied upon and, in any event, there is no coverage.  In its response to the argument that both the late notice defense and the defense arising from Trident's assignment agreement with Sea Quest fail, St. Paul seeks to factually refute the argument, and it argues that Sea Quest can show no prejudice.  In any event, it urges that the court need not reach these defenses on this motion as there simply is no coverage.  Regarding Endorsement # 31, St. Paul submits that it is inapplicable and creates no ambiguity in Exclusions (A)(2)(a) and (c) as this is not a completed operations case

---

[22]Sea Quest cites *Taurus Holdings, Inc. v. U.S. Fidelity & Guaranty Co.*, 913 So. 2d 528, 532 (Fla. 2005) for the proposition that where policy language is susceptible to more than one reasonable interpretation, it is considered ambiguous, and therefore should be liberally construed in favor of the insured.

[23]St. Paul makes the additional argument that the state court's dismissal of Sea Quest's negligence claim on the basis of the economic loss rule further underscores the conclusion that the loss here was not to "other property" in contemplation of that rule nor can it be "property damage" in contemplation of the MGL policy.

(to which the endorsement was directed), but rather involves damage to property occurring while the insured performed operations on the yacht.

II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, the discovery and disclosure materials on file, and any affidavits" in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility

determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

The parties agree that the MGL and Bumbershoot policies at issue here are to be interpreted according to Florida law. *See* (Docs. 45 at 4; 47 at 9). Under Florida law, the interpretation of an insurance contract, including resolution of any ambiguities contained therein, is a question of law to be decided by the court. *Dahl-Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1381 (11th Cir. 1993) (citing *Sproles v. Amer. States Ins. Co.*, 578 So. 2d 482, 484 (Fla. Dist. Ct. 1991). In construing an insurance contract, a court must strive to give every provision meaning and effect. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000); *Excelsior Ins. Com. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979). "Where the language of an insurance contract is clear and unambiguous, 'there is no occasion for construction.'" *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1454 (11th Cir. 1989) (quoting *Rigel v. Nat'l Cas. Co.*, 76 So. 2d 285 (Fla. 1954)). However, "exclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be

construed in favor of the insured, since it is the insurer who usually drafts the policy." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998). The party claiming coverage, i.e., Sea Quest, generally bears the burden of proof to establish that coverage exists. *U.S. Liab. Ins. Co. v. Bove*, 347 So. 2d 678, 680 (Fla. Dist. Ct. App. 1977). It follows that the insurer then bears the burden of establishing the applicability of a policy exclusion seeking to bar coverage. *U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983).

By the MGL policy, St. Paul agrees to pay "on behalf of [its] insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence. . . ." (Doc. 45-3 at 20). Thus, the issue for the court's consideration is whether the damages awarded in the Amended Final Judgment for Trident's faulty workmanship and failure to complete this yacht are "property damage" caused by an "occurrence" as those terms are defined in the MGL policy and otherwise construed under Florida law.

Under the MGL policy:

L.     "occurrence" means an accident, including continuous or repeated exposure in conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

N.     "property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically

13

> injured or destroyed provided such loss of use is
> caused by an occurrence during the policy period.

*Id.* at 17.  There is no serious argument by either party that faulty workmanship or negligent construction may constitute an "occurrence."[24]  The Florida Supreme Court has recognized as much noting that "faulty workmanship that is neither intended nor expected from the standpoint of the contractor *can* constitute an 'accident' and, thus, an 'occurrence' under a post-1986 CGL policy."  *J.S.U.B.*, 979 So. 2d at 888 (emphasis added).  No different rule would appear appropriate in the context of an MGL policy.

However, the more difficult question in this case is whether Trident's faulty workmanship and intentional conduct resulted in "property damage" covered by that same MGL policy.  Citing the *J.S.U.B.* opinion, Sea Quest argues that "faulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the policy."  *See J.S.U.B.,* 979 So. 2d at 889.  In response, St. Paul urges that the cost of repair or replacement of defective work in an uncompleted project, standing alone, does not constitute covered "property damage" under Florida law.  Indeed, even in *J.S.U.B.* the court noted, "[i]f there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage.'"  *Id.*  Both parties also cite to *Auto-Owners Insurance Co. v. Pozzi Window Co.*, 984 So. 2d 1241 (Fla. 2008), in support of their respective positions.

---

[24]While not conceding the issue, for purposes of oral arguments, counsel for St. Paul did not dispute that the negligent construction could constitute an "occurrence."  Rather, St. Paul primarily argued that the damages awarded are not "property damage" under the subject policies.

Thus, Sea Quest urges the court's holding that the cost to repair or replace property that was not initially defective but was damaged by its defective installation is property damage is applicable where, as here, the product became defective only upon Trident's construction. On the contrary, St. Paul urges that the cost of repairing, replacing and completing Trident's own defective work is not a claim for "property damage" because Sea Quest's damages were solely for the cost of correcting, removing or repairing Trident's defective work, as opposed to damage resulting from that work.

The decisions in *Pozzi Window Co.* and *J.S.U.B.*, although factually distinguishable, suggest the appropriate conclusion in this matter.[25] In resolving a certified question of law from the Eleventh Circuit,[26] the Florida Supreme Court in *Pozzi Window Co.*, first addressed its holding in *J.S.U.B.*, noting that it there held that faulty or defective workmanship "that has damaged the completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the policy. In reaching this conclusion, we rejected the insurer's arguments that faulty workmanship that injures only the work product itself does not result in 'property damage' and that there can never be 'property damage' in cases of faulty

_____

[25]Both cases involved defective work by subcontractors causing damage to the completed projects with policies providing for products completed operations hazard coverage. Here, the yacht was never completed and the faulty and defective work appears to be entirely that of Trident's. As discussed herein, these cases are instructive on the appropriate construction of "property damage" under general liability policies in Florida, but other considerations pertain as well.

[26]The Court of Appeals asked, "Does a standard form [Commercial] General Liability policy with product[s] completed operations hazard coverage, . . . , issued to a general contractor, cover the general contractor's liability to a third party for the cost of repair or replacement of defective work by its subcontractor?" *Pozzi Window Co.*, 984 So. 2d at 1243.

construction because the defective work rendered the entire project damaged from its inception. We also observed that 'if there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage.'" *Pozzi Window Co.*, 984 So. 2d at 1247 (quoting *J.S.U.B.*, 979 So. 2d at 888). Thus, the court "recognized a difference between a claim for the costs of repairing or removing defective work alone, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" *Id*. at 1248 (quoting *J.S.U.B.*, 979 So. 2d at 889). By the court's rationale, "the mere inclusion of a defective component, . . . or the defective installation . . . does not constitute property damage unless the defective component results in physical injury to *some other tangible property*." *Id.* Accepting that such rationale is equally applicable in the context of a marine general liability policy issued in Florida employing similar coverage language and definitions for "occurrence" and "property damage" and applying this rationale to the facts determined by the Bench Order, the court is obliged to conclude that the losses sustained as a consequence of Trident's negligent and faulty workmanship and intentional acts were not covered property damage in contemplation of the MGL policy. Here, Sea Quest succeeded on its claims based on the faulty and incomplete construction of the yacht, but the award made by the court was for the cost of removing and replacing the faulty work and completing the balance of the project, not for damage beyond the faulty workmanship or defective work. In the context of CGL policies employed in the State of Florida, such losses are not "property damage." *See id., J.S.U.B., 979 So. 2d at 889; West Orange Lumber Co. v. Ind. Lumbermens Mut. Ins. Co.,* 898 So. 2d

1147, 1146 (Fla. Dist. Ct. App. 2005); and *Auto Owners Ins. Co. v. Tripp Constr., Inc.,* 737

So. 2d 600, 601 (Fla. Dist. Ct. App. 1999). The court finds no basis for concluding otherwise

under the similar language of this MGL policy.

Such finding is consistent with the acknowledged purpose of comprehensive general

liability policies as articulated by the Florida Supreme Court in *LaMarche v. Shelby Mutual*

*Insurance Co.*, 390 So. 2d 325, 326 (Fla. 1980):

> The purpose of this comprehensive liability insurance
> coverage is to provide protection for personal injury or for
> property damage caused by the completed product, but not
> for the replacement and repair of that product. To interpret
> the policy as providing coverage for construction
> deficiencies, as asserted by the petitioners and a minority of
> states, would enable a contractor to receive initial payment
> for the work from the homeowner, then receive subsequent
> payment from his insurance company to repair and correct
> deficiencies in his own work. . . . Rather than coverage and
> payment for building flaws and deficiencies, the policy
> instead covers damage caused by those flaws.

Such policies are "generally designed to provide coverage for *tort liability for physical*

*damages to others and not for contractual liability of the insured for economic loss* because

the product or work is not that for which the damaged person bargained." *J.S.U.B.*, 979 So.

2d at 892 (Lewis, C.J., concurring) (quoting 9A Lee R. Russ & Thomas F. Segalla, *Couch on*

*Insurance* § 129:1 (3d ed. 2005)). While the court in *J.S.U.B.* retreated somewhat from the

broad language employed in *LaMarche,* and otherwise recognized the changing nature of such

liability policies, *LaMarche* appears good law in the circumstances of this case where the

losses were at the hands of the contractor and the award made to correct the deficiencies in

that work.[27]  The discussion in *J.S.U.B.*, addressing the modifications to the CGL policy form

and the addition of a subcontractor exception to business risk exclusions in CGL policies post-

1986, is also enlightening.  By the court's account, the subcontractor exception to the 'your

work" exclusion in such policies reflected an agreement among the insurance and

policyholder communities "that the CGL policy should provide coverage for defective

construction claims so long as the allegedly defective work had been performed by a

subcontractor rather than the policyholder itself."  *J.S.U.B.*, 979 So. 2d at 879 (citing 2 Jeffrey

W. Stempel, *Stempel on Insurance Contracts* § 14.13[D] at 14-224.8 (3d ed. Supp. 2007)).

The broad public policy articulated in *LaMarche* that such a liability policy is not intended to

provide coverage for a *policyholder's* own deficient or faulty workmanship appears unaffected

by the changes brought to the CGL form where the damage claimed is for no more than the

cost to correct the deficient and defective workmanship of the contractor.  The risks associated

with such faulty workmanship are appropriately borne by the contractor and are not covered

losses.  Such is the case here.  Again, I find no reason why a different rationale or policy

consideration should be applied to a MGL policy employing similar policy language.

　　The parties agree that this court is bound by the findings contained in the Bench

Order as neither party appealed those findings to the Eleventh Circuit and it was those

findings which subsequently formed the basis of the Amended Final Judgment in the

---

[27]In *J.S.U.B.*, the Florida Supreme Court distinguished *LaMarche*, but did not recede
from its holding.  In distinguishing between the two cases, it noted that, "[b]ecause *LaMarche*
involved a claim of faulty workmanship by the contractor, rather than a subcontractor, and
because the policy being interpreted involved distinct exclusions and exceptions, we do not
regard *LaMarche* as binding precedent in this case."  *J.S.U.B.,* 979 So. 2d at 882.  The court
declined to overrule the decision.  *Id.* at 891.

Underlying Action.  In its Bench Order, the court itemized three categories of damages caused

by Trident: (1) the cost of repair for items that were negligently constructed by Trident; (2) the

cost to repair defective items and damages caused by Trident's intentional misconduct to

avoid costs or to cover other defects; and (3) the costs for finishing items that were not yet

completed.  *See* (Doc. 47-2 at 8-16).  There appears no finding in the Bench Order nor has

there been any showing before this court that the losses so concluded were otherwise than

from Trident's own faulty workmanship or that the damages awarded were to compensate for

anything other than the repair and restoration of that deficient and incomplete work.

Consideration has been given to the case law cited by Sea Quest and particularly its

argument that Florida courts generally construe the term "property damage" broadly and its

citation to *CTC Development*, *supra*, for the proposition that "negligent construction has been

expressly held to constitute property damage."  (Doc. 45 at 6).  However, the cited cases are

distinguishable from the instant facts, and I find them unpersuasive.[28]

Here, the losses resulting from Trident's faulty workmanship on the uncompleted

vessel are not "property damage" in contemplation of the MGL policy.  Accordingly, I find

_____

[28]To the extent that Sea Quest reads *CTC Development* to hold that negligent
construction constitutes *property damage* in all situations, it gives too broad a reading to the
decision.  Further, the facts of the instant case are wholly distinguishable from those in *CTC,*
and contrary to Sea Quest's urging, when the law and facts in *CTC* are considered in light of
*Pozzi Window Co.* and *J.S.U.B.*, they support the conclusion of no property damage here.  As
for the applicability of *McCreary*, 758 So. 2d 692 (Fla. Dist. Ct. App. 2000), while the
opinion offers general tenets as to interpretation of insurance contracts under Florida law such
as ambiguities are interpreted liberally in favor of the insured and insuring clauses are
construed in the broadest possible manner to affect the greatest extent of coverage, it is
nevertheless legally and factually distinguishable.

that Sea Quest has failed to satisfy its burden of establishing coverage under the subject policies for the losses determined by the Amended Final Judgment.[29]

Sea Quest alternatively argues that coverage exists for Trident's breach of contract by virtue of the "Additional Coverages Endorsement" which expanded the definition of "incidental contract" to include "any oral or written contract or agreement related to the conduct of the named insured's business."[30] (Doc. 45 at 8). St. Paul responds that the term "incidental contract" is used solely in conjunction with Exclusion II.(A) of Section I of the MGL policy, which bars coverage for liability assumed by an insured under a contract except an incidental contract. As a consequence, it urges that the expanded definition of "incidental contract" cannot create coverage where coverage did not otherwise exist. Furthermore, it

---

[29]On this conclusion, it is unnecessary to address the matter of exclusions. However, even if the court were to conclude otherwise as to some or all of the damages in the Amended Final Judgment, coverage under St. Paul's policy appears excluded based upon the operations exclusion contained in the MGL policy. Specifically, Exclusion (A)(2)(a) precludes coverage to property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured. Courts applying Florida law have found similarly worded exclusions in CGL policies unambiguous and enforceable in circumstances where "property damage" arises from and during the performance of operations. *See Oak Ford Owners Assoc.*, 510 F. Supp. 2d at 818; *see also*, *Amerisure Mut. Ins. Co. v. American Cutting & Drilling* Co., No. 08-60967-CIV, 2009 WL 700246, at *5 (S.D. Fla. March 17, 2009); *Am. Equity Ins. Co. v. Van Ginhoven*, 788 So. 2d 388, 391 (Fla. Dist. Ct. App. 2001). Thus, even if some or all of the damage caused by Trident's faulty workmanship are determined to be covered property damage, such coverage appears excluded notwithstanding Sea Quest's objections to the contrary.

[30]"Incidental contract" was previously defined as "any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement." (Doc. 45-3 at 16).

argues that the exclusion only has application after the threshold "property damage" requisite is met.

St. Paul is correct that, under Florida law, coverage cannot be created by reliance upon a policy exclusion. *See CTC Development*, 720 So. 2d at 1074-75.  Moreover, courts interpreting endorsements expanding the definition of "incidental contract" have reached a similar result. *See Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 228 (3d Cir. 2005) (expanded definition of incidental contract merely limited reach of exclusion and did not extend coverage of policy to injury or damages which are not the result of an "occurrence" or "accident"); *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-0313 VRW, 2005 WL 2893865, at *7-8 (N.D. Cal. Nov. 2, 2005) ("language excepting incidental contracts from the contractual liability exclusion does just that and nothing more").  Similarly, the fact that the definition of "incidental contract" is expanded under the Additional Coverages Endorsement of the MGL policy appears relevant only as it relates to limiting the applicability of that particular exclusion (Exclusion II.(A)).  Absent coverage otherwise established, i.e., property damage caused by an occurrence, the endorsement cannot be relied upon to create coverage. On the court's determination above that the losses resulting from Trident's faulty workmanship are not covered "property damage," the expanded definition of "incidental contract" in the endorsement cannot be relied upon to create coverage where none exists.

As to the availability of coverage under the Bumbershoot policy, in pertinent part, it promises to indemnify Trident for all sums which it becomes legally liable to pay in respect of claims against it for property damage caused by or arising out of each occurrence happening

anywhere in the world.  *See* (Doc. 45-5 at 25).  "Property damage" is defined to mean "loss,

damage, or destruction of intangible property (other than property owned by the Named

Assured)."  *Id*. at 35.  The policy provides that "notwithstanding anything contained herein to

the contrary, in the event coverage is excluded in a policy listed in the Schedule of Underlying

Insurances, it is understood and agreed that said coverage is also excluded under this Policy

unless said coverage is provided elsewhere in a policy listed in the Schedule of Underlying

Insurances."  (Doc. 45-5 at 25).  It appears that at least since February 1998, the MGL policy

has been listed on the schedule.  *See* (Doc. 45-5 at 8).

St. Paul again argues that there is no property damage, and therefore no coverage.

However, even if there is property damage in contemplation of the Bumbershoot policy, such

coverage is excluded under Conditional Exclusion I.(e), which provides that "[a]s respects all

activities of the Assured . . . , this insurance shall be free from liability (unless coverage is

provided in a policy listed in the Schedule of Underlying Insurances, and then coverage under

this policy shall only operate as excess of such coverage): (e) for damage, loss, or expense to

another's property while in the care, custody or control of the Assured."  *See id.* at 32.[31]

Having concluded that the damages for which Sea Quest is seeking indemnity are not

"property damage" under the MGL policy in contemplation of Florida law, Sea Quest's

motion is appropriately denied as to the excess policy as well.  In any event, given the fact the

---

[31]St. Paul also cites Conditional Exclusion I.(c) which excludes coverage "assumed under contract."  Alternatively, it urges coverage is excluded under Absolute Exclusion II.(f) which excludes coverage "from the failure of an Assured's products, or work completed by or for an Assured, to perform the function or serve the purpose intended or warranted by the Assured . . ." *See id.* at 32-33.

losses here occurred while Sea Quest's property was under the care, custody or control of Trident, such appears wholly excluded from coverage.

IV.

For the foregoing reasons, it is **ORDERED** that Sea Quest International, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 45) is **denied** and St. Paul Fire and Marine Insurance Company's Dispositive Motion for Summary Judgment (Doc. 47) is **granted**. The Clerk is directed to enter Judgment in favor of the Plaintiff, St. Paul Fire and Marine Insurance Company, and to close this case. The judgment shall reflect the court's considered opinion that each party shall bear its own fees and costs.

**Done and Ordered** at Tampa, Florida, this 17th day of December 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record